**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |
|---|---|
| KENTUCKY DOWNS MANAGEMENT, INC.; KD RACING, LLC f/k/a KENTUCKY DOWNS RACING, LLC; KD PARTNERS, LLC f/k/a KENTUCKY DOWNS PARTNERS; and KYD, LLC f/k/a KENTUCKY DOWNS, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> KENTUCKY DOWNS, LLC f/k/a KENTUCKY RACING ACQUISITION, LLC; and KENTUCKY RACING HOLDCO, LLC, <br><br> Defendants. | C.A. No. 2021-0251-NAC |

**POST-TRIAL MEMORANDUM OPINION**

Date Submitted: May 13, 2025
Date Decided: August 13, 2026

Richard P. Rollo, Travis S. Hunter, John M. O'Toole, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Cory J. Skolnick, FROST BROWN TODD LLP, Louisville, KY; Aaron T. Brogdon, Zackary L. Stillings, FROST BROWN TODD LLP, Columbus, OH; *Attorneys for Plaintiffs.*

Joanna J. Cline, Christopher B. Chuff, Emily L. Wheatley, TROUTMAN PEPPER LOCKE LLP, Wilmington, DE; Michael E. Kearney, Adam J. Pernsteiner, KEARNEY PUZEY DAMONTE LTD., Las Vegas, NV; *Attorneys for Defendants.*

**COOK, V.C.**

This case involves the sale of the Kentucky Downs horse racing and gaming facility in Franklin, Kentucky. At the time the parties were negotiating the sale, pending litigation regarding the legality of Kentucky Downs' historical horse racing ("HHR") terminals loomed large—threatening sudden and catastrophic harm to the value of the business. To hedge against that risk, the buyers' lenders insisted on a $10 million holdback, payable to the sellers unless there was a "final non-appealable unfavorable ruling" in the litigation before a set date. Following the sale, and before the set date, the Kentucky Supreme Court issued an opinion, ruling that the HHR terminals were illegal under Kentucky law.

The buyers scrambled in response—fielding calls from other facilities facing similar exposure and lobbying the legislature for a fix. In the meantime, despite being advised to shut down and avoid imminent lawsuits—and seeing other facilities do just that—the buyers kept Kentucky Downs' HHR operations open to avoid defaulting on their credit agreement. The buyers' lobbying efforts paid off, and a new bill making the HHR terminals legal passed by a slim margin. As a result, Kentucky Downs never had to shut down, the lawsuits filed alleging the illegal use of HHR terminals were dismissed, and the buyers did not incur any economic loss.

Based on the Kentucky Supreme Court's ruling, the buyers refused to pay the $10 million holdback amount, and the sellers sued to recover. This case comes down to a photo finish over the interpretation of the words "final non-appealable unfavorable ruling." On a prior motion, former Vice Chancellor Slights found that both parties had offered reasonable interpretations, rendering the language

ambiguous and sending the parties to discovery. After a one-day trial on a paper record, the case is ready for the official call.

As explained below, the contract's plain text resolves most of the interpretive dispute. The Kentucky Supreme Court's decision was "final" under Kentucky procedural rules, and there was no basis for further appeal, making it "non-appealable." Whether the decision was "unfavorable" is a closer call. Sellers argue the decision was not unfavorable because Kentucky Downs did not suffer any resulting injury, as the parties intended. The buyers argue that the actual impact of the decision is irrelevant, and the parties bargained for a straight holdback based on the outcome of a specified risk event.

A review of the sparse, but telling, extrinsic evidence reveals the buyers' reading as the clear winner. The original agreement was structured to require actual loss—consistent with the sellers' interpretation. But the parties amended the agreement to remove that requirement. The sellers' interpretation would rewrite the contract to revert this bargained-for amendment. Judgment is entered for the buyers.

## I.     FACTUAL BACKGROUND

### A.     The Parties

Plaintiff Kentucky Downs Management, Inc. is a Kentucky corporation with its principal offices located in Tennessee.[1] Plaintiffs KD Racing, LLC, KD Partners, LLC, and KYD, LLC (together with Kentucky Downs Management, "Sellers") are

---

[1] Dkt. 97, Pretrial Stipulation and Order ("PTO") ¶ 1. The parties' joint exhibits are cited as "JX### at __."

2

Kentucky limited liability companies with their principal offices located in Tennessee. [2] Ray Reid is President of KD Partners and Kentucky Downs Management. [3]

Defendant Kentucky Downs, LLC f/k/a Kentucky Racing Association, LLC ("KRA") is a Kentucky limited liability company with its principal offices located in Nevada. [4] Defendant Kentucky Racing Holdco, LLC (together with KRA, "Buyers") is a Delaware limited liability company with its principal offices located in Nevada. [5] Buyers are managed by a board of managers, including Ronald Winchell and Marc Falcone. [6]

**B.      HHR at Kentucky Downs**

In July 2010, the Kentucky Horse Racing Commission ("Commission") promulgated regulations to facilitate the introduction of HHR terminals at racetracks in Kentucky. [7] HHR is a wagering system that shows replays of horse races that have

---

[2] PTO ¶¶ 2–4.

[3] JX010 at 6.

[4] PTO ¶ 5.

[5] PTO ¶ 6.

[6] JX012 ("Winchell Dep.") at 5:14–23; JX013 ("Falcone Dep.") at 5:19–6:4; JX006 at 2; JX019 at 4.

[7] PTO ¶ 7.

3

been run at approved racing facilities. The system presents these races by video display on an electronic device, where individual bettors place wagers.[8]

From 2007 to 2018, Plaintiff KYD, LLC owned and operated the Kentucky Downs racetrack and gaming facility at the center of this dispute. Following the Commission's 2010 regulations, Kentucky Downs offered HHR wagering through several hundred HHR machines, in addition to live turf racing.[9]

Kentucky Downs exclusively used "Exacta" HHR machines.[10] Exacta is an HHR systems provider that receives a share of the revenue stream derived from its systems at gaming venues, such as Kentucky Downs.[11] Although two other HHR systems providers existed (PariMax and Ainsworth), they did not provide viable alternatives for Kentucky Downs. Kentucky Downs was in trade secrets litigation

---

[8] PTO ¶ 8. *See Appalachian Racing, LLC v. Family Tr. Found. of Ky., Inc.*, 423 S.W.3d 726, 730 (Ky. 2014) ("Historical horse races are horse races that have been run sometime in the past at an approved racing facility and are then currently presented in the form of a video display on an electronic device, or terminal, at which individual wagerers may place bets. One such device, similar in appearance to a slot-machine, is a patented product marketed under the name 'Instant Racing.' The bettor inserts money or its equivalent into the Instant Racing terminal and then chooses a horse identified by a number. The terminal then displays a video recording of the race for the better to watch, or, as the name 'Instant Racing' implies, the bettor may forego the excitement of the actual race by opting to see immediately the results of the race and the outcome of his wager. Bettors are not given information from which they might identify the specific time and place of the actual running of the race, or the identity of the horse, but some statistical data regarding the horses is provided for bettors who wish to place their bets with some degree of deliberation.").

[9] PTO ¶ 9.

[10] Falcone Dep. at 15:9–11.

[11] JX015 ("Aronson Dep.") at 11:5–15.

4

against PariMax.[12]  And Ainsworth worked exclusively with another racetrack and gaming facility in Kentucky.[13]

During its early years at Kentucky Downs, HHR showed immense market potential.  After HHR was first introduced at Kentucky Downs in September 2011, "the total amount of betting at Kentucky Downs on HHR alone for that final quarter was 29 million[.]"[14]  "And the numbers from there on out were extraordinary."[15]  The amount of betting on HHR machines increased to $190 million in 2012 and to $350 million in 2018.[16]  By 2023, "the amount of money bet on HHR in the United States for the first time exceeded the total amount bet on live horse racing[.]"[17]  According to Sellers' broker, Tom Aronson, "it's fair to say that in many places HHR saved horse racing and breeding."[18]

## C.     The Family Foundation Case

In July 2010, the Commission, the Kentucky Department of Revenue, Plaintiff KYD, LLC, and several horse racing associations ("Petitioners") commenced an

---

[12] Falcone Dep. at 15:9–19; Winchell Dep. at 30:18–31:2.

[13] Falcone Dep. at 15:9–19; Winchell Dep. at 31:3-25.

[14] Aronson Dep. at 29:1-3.

[15] Aronson Dep. at 29:9-10.

[16] Aronson Dep. at 29:13-16.

[17] Aronson Dep. at 30:12-14.

[18] Aronson Dep. at 31:8-9.  Aronson is the President of Racing Resource Group, Inc., a consultancy in the racing and gaming business.  Aronson Dep. at 4:10-12.

"agreed case" in the Franklin County Circuit Court in Kentucky (the "Family Foundation Case").[19] Petitioners sought a declaration that the Commission's HHR regulations were valid, and that bets placed on the Exacta system were a permissible form of "pari-mutuel wagering" under Kentucky law.[20] Pari-mutuel wagering requires patrons to wager on the same horse races among themselves.[21] At the time, Kentucky mandated by statute that wagering systems be pari-mutuel.[22]

The Franklin Circuit Court permitted a Kentucky non-profit, the Family Trust Foundation of Kentucky ("Family Foundation"), to intervene. The Family Foundation opposed Petitioners' requests and challenged the validity of the Commission's newly enacted regulations.[23] The case "struck right at the heart of what Kentucky Downs was doing with [HHR] . . . and the importance . . . [it was] developing around the future of Kentucky horse racing."[24]

---

[19] PTO ¶ 10; *see also* JX018 at 2. The parties subsequently referred to the litigation in the relevant transactional documents as the "Family Foundation Case." PTO ¶ 11. Buyers were never named parties in the Family Foundation Case. PTO ¶ 12.

[20] PTO ¶ 10; *see also* JX018 at 1 n.1, 4–5 & n.3.

[21] *See, e.g., Fam. Tr. Found. of Kentucky, Inc. v. Kentucky Horse Racing Comm'n*, 620 S.W.3d 595, 601 (Ky. 2020) ("To be clear, pari-mutuel wagering requires that patrons generate the pools based on wagering on the same discrete, finite events. Only in that way are patrons 'wagering among themselves' and setting the odds and the payouts, the exceptions being possible minimum payouts and minus pools.") (citation omitted).

[22] *Id.* at 597–98 (citing Ky. Rev. Stat. §§ 230.215, 230.361).

[23] PTO ¶ 13; JX014 ("Reid Dep.") at 14:1–18.

[24] Aronson Dep. at 39:6–13.

The Family Foundation Case turned into protracted litigation that involved numerous procedural twists and hurdles.[25] After eight years of litigation, the Franklin Circuit Court held a bench trial in January 2018.[26] On October 24, 2018, the circuit court determined that the Exacta system used by Kentucky Downs constituted pari-mutuel wagering under Kentucky law, and thus was statutorily valid.[27] The Family Foundation appealed to the Kentucky Court of Appeals,[28] which then transferred the appeal directly to the Kentucky Supreme Court.[29]

## D. Buyers Express Interest in Acquiring Kentucky Downs

In the spring of 2018—while the Family Foundation Case was still pending before the Franklin Circuit Court[30]—Winchell and Falcone learned that Sellers were

---

[25] The Franklin Circuit Court initially entered judgment in favor of Petitioners. PTO ¶ 14. The Family Foundation appealed to the Kentucky Court of Appeals. PTO ¶ 15. In June 2012, the Kentucky Court of Appeals affirmed the Franklin Circuit Court's decision that the case presented a justiciable controversy but concluded that the Family Foundation should be afforded the opportunity to conduct discovery. PTO ¶ 16. The Petitioners appealed that June 2012 ruling to the Kentucky Supreme Court. PTO ¶ 17. In February 2014, the Kentucky Supreme Court affirmed the Kentucky Court of Appeals' June 2012 ruling as it pertained to discovery, but found that other issues could properly be decided as a matter of law. PTO ¶ 18. The Kentucky Supreme Court remanded to the trial court. PTO ¶ 19.

[26] PTO ¶ 20.

[27] PTO ¶ 21.

[28] PTO ¶ 22.

[29] PTO ¶ 23.

[30] *See* JX018 at 4 ("On October 24, 2018, the [Franklin Circuit] Court entered its Opinion and Order setting forth its Findings of Fact and Conclusions of Law that the Exacta System was a pari-mutuel system of wagering legally permitted under Kentucky law.").

trying to sell Kentucky Downs.[31]  Winchell and Falcone expressed interest and were

put in contact with Sellers' representatives.  This led to discussions between Winchell

and Falcone, on the one hand, and Reid and Aronson, on the other. [32]

The parties discussed valuation.[33]  Sellers were impressed and believed that

Buyers could take Kentucky Downs "to the next level[.]"[34]  During due diligence,

Winchell and Falcone learned about various risks associated with the business,

including the Family Foundation and Trade Secrets Cases. [35]  Sellers repeatedly

conveyed their belief that the risks associated with the Family Foundation Case were

minimal based on the history of the litigation.[36]

Falcone and Winchell sought third-party financing for their impending

acquisition. [37]  Around fall 2018, they solicited "letters of intent on financing

packages" from "a dozen or so" potential lenders, including sophisticated investing

---

[31] JX008 ¶ 4; Winchell Dep. at 11:1–12:23; Falcone Dep. at 9:3–12, 13:14–24.

[32] Reid Dep. at 7:15–10:5, 26:1–25; Winchell Dep. at 12:11–13:14; Falcone Dep. at 9:3–12; JX019 at 18.  Aronson acted as Sellers' broker early in the deal.  *See* Aronson Dep. at 15:13–16:4; Reid Dep. at 8:3–19.

[33] Reid Dep. at 9:13–25.

[34] Reid Dep. at 18:18–20.

[35] *See* JX003 at 89 (defining "Trade Secret Cases" as two lawsuits pending in the United States District Court for the Western District of Kentucky).

[36] Winchell Dep. at 14:9–15:23.

[37] Falcone Dep. at 9:3–25.

institutions.[38] In connection with that process, Falcone and Winchell worked with Credit Suisse to prepare a presentation disclosing the risks associated with the acquisition, including the Family Foundation Case.[39] At the time, HHR was still relatively unknown in the capital markets as an alternative gaming opportunity.[40] Buyers sought to explain how HHR worked, its legal aspects, and the potential implications of the Family Foundation Case.[41] The lenders were keen to understand the legal risks and hired counsel to assess the litigation.[42] Indeed, Winchell testified that this "was one of the biggest factors" in Buyers' search for a lender.[43] During this time, the Franklin Circuit Court's decision that "the Exacta System was a pari-mutuel system of wagering legally permitted under Kentucky law" was appealed to the Kentucky Court of Appeals and subsequently transferred to the Kentucky Supreme Court.[44]

Only a "small group of three investors" committed to financing the deal.[45] As Reid put it: "[F]inancing a transaction that deals with gaming is difficult in itself. . . .

---

[38] Falcone Dep. at 10:1–19.

[39] Falcone Dep. at 10:20–11:12.

[40] Falcone Dep. at 11:19–12:25.

[41] Falcone Dep. at 11:19–12:25.

[42] Falcone Dep. at 11:19–12:25; Winchell Dep. at 27:19–28:10.

[43] Winchell Dep. at 28:9–10.

[44] JX018 at 4.

[45] Falcone Dep. at 10:1–19.

[T]here's lots of banks [] that don't want to get involved[.]"[46] Ultimately, Buyers entered a credit arrangement led by Summit Capital, a private equity fund with sophisticated long-term investors in the casino business.[47]

## E. The Parties Enter into the APA

On November 5, 2018, while the Family Foundation Case was pending before the Kentucky Court of Appeals, the parties entered into an Asset Purchase Agreement ("APA"), which contemplated KRA's purchase of Kentucky Downs for $185,000,000.[48] Winchell, Falcone, and Aronson were involved in negotiating the terms.[49] Reid approved the terms on Sellers' behalf.[50] The APA included a holdback escrow amount of $20 million with respect to the Family Foundation Case and the then-pending Trade Secret Cases.[51] The parties tethered the holdback escrow to indemnifiable losses.

Section 2.05 of the APA, entitled "Payment of Holdback Escrow Fund," provided in relevant part:

(a) Family Foundation Case. The Parties agree that Ten Million Dollars
. . . of the Holdback Escrow Fund shall be immediately released from the

[46] Reid Dep. at 29:7–18.

[47] Falcone Dep. 13:18-24.

[48] PTO ¶ 24; JX003 at 9–10; JX006 ¶ 8.

[49] *See, e.g.*, JX001; Reid Dep. at 7:15–8:2. Although the parties executed the APA in early November 2018, the transaction did not close then, and the terms of the parties' agreement were the subject of further negotiations, as explained below.

[50] *See, e.g.*, JX003 at 160; JX010 at 6.

[51] *See* JX003 § 2.05; JX019 at 22.

Holdback Escrow Fund to Seller Group if there is a favorable final non-appealable ruling in Franklin Circuit Court, or a subsequent favorable decision in Kentucky Court of Appeals, with respect to the Family Foundation Case[.]

(b) <u>Trade Secret Cases.</u>  The Parties further agree that Ten Million Dollars . . . of the Holdback Escrow shall be immediately released from escrow to Seller Group if there is a favorable final non-appealable ruling in US District Court with respect to both Trade Secrets Cases[.][52]

The APA defined "Family Foundation Case" to "mean[] the lawsuit in Franklin Circuit Court, Commonwealth of Kentucky, Case No. 10-CI-1154."[53]

Section 2.05(e) provided:

<u>Unfavorable Rulings</u>. If there shall be a non-appealable Unfavorable Ruling in either the Family Foundation Case or the Trade Secret Cases prior to the second [] anniversary date of the Closing Date, Purchaser shall be entitled to payment of an amount equal to its indemnifiable Losses determined in accordance with <u>Article XII</u> out of the Holdback Escrow Fund, subject to the $20,000,000.00 aggregate cap on Seller's indemnification obligation set forth in <u>Section 12.01(d)</u> and the other limitations on Seller Group's indemnification obligations and with respect to the calculation of Losses set forth in <u>Article XII</u>, but excluding the Deductible referred to in <u>Section 12.01(c)</u>.[54]

The parties worked extensively on the language in Section 2.05, which reflected a "quantification of risk" driven by Buyers' lenders.[55]

---

[52] JX003 at 13–14.

[53] JX003 at 81.

[54] JX003 at 15.

[55] Falcone Dep. at 13:1–13; Aronson Dep. at 21:12–22:13; *see also, e.g.*, JX001 at 2 (proposal to delete "final non-appealable" language was not acceptable to Buyers because it "will significantly hinder our ability for financing"; "The 2 year collar is a difficult enough hurdle as it is; an already contentious item with lenders").  In December 2018, the parties also executed Amendment No. 1 to the APA.  PTO ¶ 25.  That amendment did not alter any

11

**F.** **Buyers and Their Lenders Express Concern Regarding the Family Foundation Case**

As the deal progressed, Buyers and their lenders developed a fuller understanding of the Family Foundation Case.[56] It became clear to them that an unfavorable ruling presented an existential risk to Kentucky Downs.[57] The Family Foundation was backed by an "extremely wealthy and influential person in Kentucky."[58] Buyers became convinced the Family Foundation would "take this [case] all the way to the end."[59] And Buyers came to realize that if the Kentucky Supreme Court ruled unfavorably against Petitioners, then Kentucky Downs' HHR

---

contractual language that would be pertinent here. *See, e.g.*, JX006 at 3; Dkt. 1, Verified Complaint ("Compl.") ¶ 31 & Ex. B; Dkt. 23 at 6 n.11.

[56] Winchell Dep. at 12:11–23, 14:9–17:2, 18:7–19, 49:10–50:3.

[57] *See, e.g.*, JX008 ¶ 10 ("From [Buyers'] perspective at the time . . . an Unfavorable Ruling was viewed as an unmitigated disaster, as it meant the potential loss of the business. And, at the time, there was no way for us to know how the Family Foundation Case would turn out in the end. We also had no idea how any Unfavorable Ruling would be received[.]"); Winchell Dep. at 18:7–19 ("[A]n unfavorable ruling to us meant . . . potentially . . . sudden death[.]"); *see also* Aronson Dep. at 21:12–21 ("The [] case evolved into the single-most greatest threat to the sale[.]").

[58] Winchell Dep. at 14:9–15:23.

[59] Winchell Dep. at 14:9–15:23.

business "would be in big trouble" and, given the political environment's "religious undertone[,]" "this could be a massively big problem for the operating business."[60]

Kentucky was not known for promoting gaming.[61] Additionally, at the time the Family Foundation Case was on appeal, the state was in the midst of a gubernatorial election, and the incumbent was perceived as "anti-gaming."[62] The governor chose the Commission's members, so political recourse was uncertain.[63] Given that the Family Foundation Case concerned the Exacta system, and Kentucky Downs was unable to use other HHR systems, Buyers became concerned that an unfavorable ruling could impose serious risks, including bankruptcy.[64]

These risks made Buyers' lenders uncomfortable and became the lenders' primary focus.[65] The risks took on even greater salience considering the sale

---

[60] Winchell Dep. at 15:24–17:2.

[61] JX008 ¶ 10.

[62] Winchell Dep. at 28:25–29:19, 74:8–75:1; Falcone Dep. at 21:16–22:14.

[63] Winchell Dep. at 74:8–75:1.

[64] Falcone Dep. at 14:23–16:2 (discussing potential of having "no sources of revenue with no ability to operate the Exacta Game products" resulting in "complete wipeout of all the equity"); *id.* at 26:12–27:1 (discussing "different variations of risks that aren't directly assigned to specific financial loss"); *id.* at 54:3–22 ("We would have never been able to gauge the magnitude and significance of [an adverse ruling].").

[65] Reid Dep. at 10:12–23; Winchell Dep. at 14:9–17:2, 25:15–28:10.

13

premium that Buyers had agreed to pay.[66]  The lenders exerted pressure on Buyers to revisit the Family Foundation Case holdback language.[67]

## G.     The Parties Negotiate and Execute the Second Amendment

The parties returned to the bargaining table to negotiate an amendment to the APA's terms.  Their lawyers, the lenders, Reid, Falcone, and Winchell were all involved.[68]  The lenders wanted a larger holdback amount, an expanded time period, and very specific language about how funds would be released.[69]  Buyers "had to negotiate those requests down,"[70] but they succeeded in converting the Family Foundation Case holdback from an up-front $10 million payment that would be held in escrow to cover indemnifiable losses, to a straightforward $10 million conditional deferred-payment obligation, reducing the amount Buyers would need to borrow up

---

[66] Winchell Dep. at 15:24–16:2, 54:21–55:16 ("[A]s we learned and we talked to lenders, it was a higher risk."); Falcone Dep. at 11:19–16:22, 35:9–20 ("We paid ten times 2018 EBITDA.  Market industry standards are six to eight times").

[67] Falcone Dep. at 13:14–14:22.  In addition to Buyers' lenders' concerns, Sellers had settled the Trade Secret Cases, which provided further reason to amend the APA.  Reid Dep. at 11:9–12:15, 18:1–20, 37:1–19; Winchell Dep. at 18:20–19:25, 24:10–25:12, 66:12–21; JX008 ¶ 9; JX016 at 3; JX019 at 22.

[68] *See, e.g.*, JX019 at 18; Reid Dep. at 55:19–24; Winchell Dep. at 61:16–64:6, 80:12–81:10; Falcone Dep. at 48:13–50:12.  Aronson was not involved in the negotiation of the Second Amendment.  Aronson Dep. at 23:23–24:11.

[69] Falcone Dep. at 13:1–14:22.

[70] Falcone Dep. at 13:1–14:22.

front.[71] This "right-size[d]" the risk given the sale premium[72] and also provided added "visibility and certainty" to Buyers' lenders.[73]

As part of the give-and-take, Sellers required Winchell and Falcone to execute guarantees to support Buyers' obligation to pay the holdback.[74] Buyers also had to agree to "very restrictive" language in the credit agreement on their use of funds, including their ability to draw the $10 million holdback amount in the event that it became due.[75] The parties further agreed to remove language regarding the Trade Secret Cases, which had been resolved, and the APA's prior escrow indemnification framework.[76] The parties agreed that Sellers would receive Rollover Units, plus cash

---

[71] JX008 at 6-7; JX009 at 3; JX016 at 3; Reid Dep. at 11:9–12:15, 18:1–20, 37:1–38:10, 40:4–42:11; Winchell Dep. at 42:13–43:13; Falcone Dep. at 35:21–36:6, 49:22–50:2.

[72] Winchell Dep. at 21:20–22:10, 42:13–43:13, 54:21–55:16, 84:21–85:14.

[73] Winchell Dep. at 84:21–85:14; Falcone Dep. at 49:22–53:10.

[74] JX005; JX009 at 1–4; Winchell Dep. at 24:10–25:12 ("I don't like personal guaranties. But . . . it was something we had to give to kind of get to the finish line."), 32:24–33:22 ("[T]hat was one of our gives . . . at the request of the seller[.]"); Falcone Dep. at 35:21–36:6, 46:1–48:3.

[75] Falcone Dep. at 13:1:–14:22 (testifying that the lenders "wanted very specific language about how funds would be released as part of a holdback provision . . ., which, . . . was very restrictive on how we could invest and how we could make payments outside of the credit to solve things such as the holdback provision");*see also id.* at 50:19–51:2 ("We had to negotiate into the credit agreement that we could draw a $10 million associated with the [holdback] payment, so there was a specific clause in the credit agreement that enabled us to make that $10 million payment, and that was approved by the lenders, and that was ultimately agreed to as part of the [Second Amendment]."); JX009 at 1–3;.

[76] JX009 at 1; JX016 at 3; *see generally* JX004.

15

consideration of $172,650,000.[77] After various revisions, the parties formalized these changes by executing Amendment No. 2 to the APA ("Second Amendment").[78]

The Second Amendment amended Section 2.05 "in its entirety," replacing the APA's original Section 2.05(a)–(e), with a new Section 2.05(a)–(b).[79] The Second Amendment removed any reference to escrow from Section 2.05(a).[80] As amended, Section 2.05(a) provides in relevant part:

> Family Foundation Holdback. The Family Foundation Holdback Amount shall be paid to Contributor Group[81] (i) if there is a final non-appealable ruling in favor of the defendants in the Family Foundation Case . . . or (iii) so long as on the second (2nd) anniversary of the Closing Date [*i.e.*, March 8, 2021] there has not been a non-appealable Unfavorable Ruling prior to that date.[82]

The parties also replaced the original Section 2.05(e) with a new Section 2.05(b), removing any language regarding "indemnifiable Losses" along the way. As amended, Section 2.05(b) provides:

> Unfavorable Rulings. If there shall be a non-appealable Unfavorable Ruling in the Family Foundation Case prior to the second [] anniversary date of the

---

[77] See JX004 at 2; Winchell Dep. at 29:20–30:15.

[78] JX004 at 1, JX010 at 10; JX019 at 22; PTO ¶¶ 26–29.

[79] JX004 at 3; PTO ¶ 27.

[80] JX004 at 3, 9; PTO ¶ 30.

[81] "Contributor Group" is defined as Kentucky Downs Partners, LLC, Kentucky Downs, LLC, and Kentucky Downs Racing, LLC. JX004 at 1 (Preamble). This same group was defined in the APA as the "Seller Group." JX003 at 1 (Preamble).

[82] JX004 at 3 (emphasis added); PTO ¶ 30.

16

Closing Date, KRA shall have no obligation to pay the Family Foundation Holdback Amount.[83]

The Second Amendment defines "Unfavorable Ruling" as:

> a final non-appealable unfavorable ruling in the Family Foundation Case against Contributor, finding either that (A) the Exacta HHR Terminals are not pari-mutuel horse racing games, or (B) the Commission's treatment of HHR under its regulations are invalid.[84]

The parties' choice of a two-year holdback period reflected the understanding that they were "dealing with the legal process and an unknown[.]"[85]

The Second Amendment gave Buyers' lenders the assurance they needed to move forward with the deal and the flexibility the parties needed to close.[86] The deal closed on March 8, 2019, as the Family Foundation Case remained pending before the Kentucky Court of Appeals.[87]

---

[83] JX004 at 4; PTO ¶ 32. The parties retained language about losses in other sections not pertaining to the Family Foundation Holdback. *See, e.g.*, JX004 at 7–9.

[84] JX004 at 9; PTO ¶ 31. The Second Amendment did not amend the APA's definition of Family Foundation Case. *See* JX004 at 8–9.

[85] Winchell Dep. at 28:11–24; Reid Dep. at 21:6–19; *see also id.* at 10:12–23 ("I think there were several reasons for [the Second Amendment]. One is to help the Winchell group fund their transaction. By that, I mean he called me and expressed his concern or the concern of the potential lenders in the transaction that the risk involved in terms of the transaction [was] making them uncomfortable. And he and I had discussions related to that, and part of those discussions were reflected here. The wording of this, I assumed, mirrored what we had discussed.").

[86] Reid Dep. at 11:9–13:25, 18:1–20; Falcone Dep. at 54:1–55:17.

[87] *See, e.g.*, Winchell Dep. at 33:24–34:9.

## H. The Kentucky Supreme Court Issues Its Opinion in the Family Foundation Case

On June 13, 2019, the Kentucky Court of Appeals transferred the Family Foundation Case to the Kentucky Supreme Court.[88]  On September 24, 2020, the Kentucky Supreme Court issued an Opinion reversing the Franklin Circuit Court's October 24, 2018, decision in the Family Foundation Case ("Family Foundation Opinion").[89]  The Kentucky Supreme Court determined that "the only legal wagering is pari-mutuel as authorized by KRS Chapter 230," and that the Exacta terminals "do[] not create a wagering pool . . . as required for pari-mutuel wagering[.]"[90]  The Kentucky Supreme Court remanded "for entry of a judgment consistent with this opinion."[91]  Petitioners sought a rehearing.[92]  On January 21, 2021, the Kentucky Supreme Court summarily denied Petitioners' request.[93]  That same day, the Clerk of the Supreme Court of Kentucky issued a Memorandum stating that "PURSUANT

---

[88] Compl. ¶ 29; PTO ¶ 23.

[89] PTO ¶ 35; *Fam. Tr. Found.*, 620 S.W.3d at 596.

[90] *Fam. Tr. Found.*, 620 S.W.3d at 598–603 (wagering on Exacta machines "by no means can be considered [] pari-mutuel").

[91] *Id.* at 597; PTO ¶ 35.

[92] PTO ¶ 36.  In their Petition for Rehearing, Petitioners raised a procedural due process argument for the first time.  *See* TT 39:21–41:18; Dkt. 22, Ex. 5 at 13.

[93] PTO ¶ 37; JX011 at 2.

TO CIVIL RULE 76.30(2)(E), THE DECISION IN THE ABOVE CAPTIONED APPEAL HAS BECOME FINAL."[94]

The Family Foundation Opinion "shock[ed]" the HHR industry.[95] Buyers immediately began to devise a plan to deal with the situation.[96] Buyers communicated with other HHR gaming facilities and their legal representatives to assess the risk.[97] Ultimately, Buyers decided on a strategy that included keeping the HHR machines running while simultaneously lobbying the legislature to change the law.

## I.    Buyers Risk Continued Operation of Kentucky Downs' HHR Machines

After the Kentucky Supreme Court issued its Family Foundation Opinion, Buyers' attorneys and industry experts advised them to shut down the Exacta HHR terminals.[98] Continued HHR operation risked substantial exposure under Kentucky's Loss Recovery Act, which allows losing gamblers to reclaim money lost on illegal wagers.[99] And if the losing gambler fails to sue within six months after the

---

[94] JX011.

[95] Winchell Dep. at 34:22–35:10.

[96] Falcone Dep. at 14:23–16:2, 16:23–20:1 ("[F]irst was . . . how do we fix this?  How quickly can we fix this?  And how long will we have until any impact related to the Supreme Court decision would take effect?  And so we immediately started to come up with ways to fix this[.]").

[97] Winchell Dep. at 35:11–37:6.

[98] Winchell Dep. at 70:23–72:13; Falcone Dep. at 23:23–24:18.

[99] Ky. Rev. Stat. § 372.020.

loss, "any other person may sue the winner and recover treble the amount or value of the money or thing lost[.]"[100]

Buyers learned that other gaming facilities were turning off their HHR machines to avoid such exposure.[101] Nonetheless, Buyers concluded that they "didn't have the option to shut down" HHR at Kentucky Downs because of the "very tight credit agreement" with their lenders.[102] Buyers determined that, if they did shut down HHR, they would be in default under their loan terms.[103] Buyers thus elected to risk continuing to operate the HHR machines.[104] In December 2020 and January 2021, two separate lawsuits were filed against Kentucky Downs under the Loss

---

[100] Ky. Rev. Stat. § 372.040. *See also* JX006 at 4 (describing Loss Recovery Act lawsuits filed against Buyers following the Family Foundation Opinion); Winchell Dep. at 35:1137:6, 70:23–71:18 (discussing "3X every . . . dollar bet"); JX019 at 20 ("Damage[s] under the Loss Recovery Act are based upon gaming 'handle.' If the plaintiffs in the Loss Recovery Cases were to recover damages, the damages would be trebled under the [L]oss [R]ecovery [A]ct. The gaming handle at Kentucky Downs [] in 202[0] was $926 million and $1,924 million in 2021.").

[101] Winchell Dep. at 35:11–37:6 ("So they shut down their business for an extended period of time . . . because they didn't want to accept the risk."), 70:23–71:18 ("Red Mile did not want to take the risk because they were concerned the Loss Recovery [Act] . . . would have a billion-dollar judgment against them."); Falcone Dep. at 23:23–24:18.

[102] Winchell Dep. at 70:12–72:13; Falcone Dep. at 23:23–24:18.

[103] Winchell Dep. at 35:11–37:6, 70:16–72:13 ("That was a very big conversation at the time . . . a huge concern . . . but since we had a lender and we owed money, if we shut down . . . we were technically in default of our loan. So we were kind of backed into a corner. We had to operate. . . . [O]ur lender could technically foreclose us."); Falcone Dep. at 23:23–24:18 ("[W]e had no ability to shut down or else we were in default of the loan and the assets would be foreclosed over to the lenders.")

[104] Winchell Dep. at 35:11–37:6, 70:16–72:21; Falcone Dep. at 23:23–24:18; PTO ¶ 44. Buyers instructed the technicians at Kentucky Downs to attempt to modify the HHR machines to conform to the Kentucky Supreme Court's Family Foundation Opinion. Reid Dep. at 16:5–17:16.

Recovery Act. Both cases cited the Kentucky Supreme Court's Family Foundation Opinion and alleged that Kentucky Downs had illegally operated HHR.[105]

## J.   Buyers Successfully Lobby for a Legislative Solution

Buyers believed that the only way to resolve the situation caused by the Family Foundation Opinion was to push for legislation to legalize HHR.[106] The various HHR gaming facilities did not undertake a coordinated lobbying effort.[107] Winchell and Falcone, with the help of Kentucky Downs' lobbyists, had to solve the problem through their own efforts.[108]

Winchell and Falcone spent nearly half a year campaigning across Kentucky to drum up support for the legislation.[109] They pressed pause on other opportunities for Kentucky Downs to focus on these endeavors.[110] Public reception was mixed.[111]

---

[105] Dkt. 16, Exs. E at 3 n.1 & F at 6; JX006 at 4–5; Falcone Dep. at 41:17–42:1.

[106] Falcone Dep. at 17:11–18:3; Winchell Dep. at 50:24–52:2 ("[O]bviously we were trying to save our skin, if you will, save our investment, save our business.").

[107] Falcone Dep. at 22:15–23:22 ("We did not necessarily have a coordinated effort, not because we didn't try, but at the time and even to this day, many of the different racetracks have different viewpoints as to working together versus not working together.").

[108] Winchell Dep. at 22:11–19 ("And it's ultimately what happened was myself and Marc [Falcone] had to go solve this problem. No one else was helping us."); *id.* at 50:24–52:20; Falcone Dep. at 22:15–23:22; Reid Dep. at 50:7–16.

[109] Winchell Dep. at 35:11–38:15, 39:9–41:5, 50:24–52:20; Falcone Dep. at 18:4–20:1, 46:1–15 ("[A] hundred percent of my waking hours were dedicated to resolving the financial position and outcome of the Supreme Court ruling").

[110] Winchell Dep. at 41:6–42:12; Falcone Dep. at 31:19–32:22.

[111] Falcone Dep. at 19:16–20:20 ("Most people felt supporting something of this nature was a black eye in their churches and their local communities."); Winchell Dep. at 37:7–38:15.

Buyers eventually convinced sufficient legislators to bring a bill (Senate Bill 120) to the floor that would revise the definition of pari-mutuel wagering to include HHR. On the day of the vote, Buyers were still down a handful of votes for the bill's passage. They were told that the situation was grim.[112]  Buyers made a last-minute concession, offering to provide a letter of commitment to evaluate a potential tax increase,[113] after which the legislature passed the bill by a slim margin.[114]  On February 22, 2021, the Governor signed the bill.[115]

## K.  The Franklin Circuit Court Enters Final Judgment in the Family Foundation Case, and the Loss Recovery Act Lawsuits Are Dismissed

The Kentucky Supreme Court had remanded the Family Foundation Case to the Franklin Circuit Court for entry of judgment consistent with the Family Foundation Opinion.  On March 17, 2021, following the passage of Senate Bill 120, the Franklin Circuit Court issued its final judgment.[116]  The final judgment provided:

> Pursuant to the Kentucky Supreme Court's [] Opinion, the Court **VACATES** its October 24, 2018, Opinion and Order, and holds that the Exacta System . . . is not a form of pari-mutuel wagering under the laws

---

[112] Winchell Dep. at 39:9–41:5.

[113] Falcone Dep. at 19:16–22:7; Winchell Dep. at 39:9–41:5.

[114] Falcone Dep. at 20:21–21:15 ("That ultimately proved to be one of the key aspects of getting the necessary support to swing the Senate Bill 120 in favor of legalization."), 42:13–43:4; Winchell Dep. at 39:9–42:12 ("[The Governor] said, 'Get me that letter in 30 minutes and I'll get it on the floor.  I'll get you the votes[.]' . . . That's how this got passed.  All the way to the very end. . . . I don't think anybody can calculate that level of risk. . . . [W]e were behind the whole time[.]"); *id.* at 74:8–75:15.

[115] PTO ¶¶ 38–39; *see also* An Act Relating to Pari-Mutuel Wagering and Declaring an Emergency, S.B. 120 (Ky. 2021); Ky. Rev. Stat. § 230.210(15).

[116] JX018.

22

in effect at the time of the Kentucky Supreme Court's September 24, 2020, Opinion. The Court concludes that this Final Judgment shall not have retroactive application because the racing associations were operating systems of wagering duly authorized and permitted by the [Kentucky Horse Racing Commission] and the racing associations were not operating the systems of wagering in contradiction of any court order. Any prospective application of this Final Judgment is subject to the newly enacted Senate Bill 120.[117]

The Family Foundation then unsuccessfully moved the trial court to eliminate its denial of retroactive application of the Kentucky Supreme Court's Opinion.[118] And the Family Foundation unsuccessfully appealed the judgment on the question of whether the Kentucky Supreme Court's Opinion would have retroactive effect.[119]

In addition, KRA eventually obtained dismissals in the Loss Recovery Act cases.[120] Because the Loss Recovery Act cases were resolved favorably, Buyers did not experience any economic loss from them.[121] On the whole, Kentucky Downs' business and Sellers' investments in it have prospered.[122]

---

[117] JX018 at 5; *see also id.* n.3 ("This Final Judgment is intentionally silent with regard to the legality of the Exacta System . . . under the newly enacted . . . Senate Bill 120."); PTO ¶¶ 40–42.

[118] Dkt. 20, Ex. 3 at 5–6.

[119] Dkt. 20, Ex. 4; PTO ¶ 43. *See generally Fam. Tr. Found. of Ky., Inc. v. Ky. Horse Racing Comm'n*, Case No. 2021-SC-0136 (Ky. 2021); *Fam. Tr. Found. of Ky., Inc. v. Ky. Horse Racing Comm'n*, Case No. 2021-CA-0425 (Ky. Ct. App. 2021).

[120] JX006 at 4–5.

[121] Falcone Dep. at 40:24–42:1.

[122] Reid Dep. 18:1–19:2 ("[T]hey've done a very great financial job. . . . [T]he value of my investment is probably worth five times what I invested.").

## L.    This Litigation

Sellers filed this action in 2021 when Buyers refused to pay the Family Foundation Case holdback.[123]   The Complaint contains one count for specific performance and another for breach of contract in the alternative.[124]   Both counts are premised on allegations that Buyers breached Section 2.05 of the Second Amendment by failing to pay the holdback despite the purported absence of an Unfavorable Ruling before March 8, 2021.[125]

Buyers moved to dismiss under Rule 12(b)(6), and Sellers cross-moved for Summary Judgment.[126]   The parties disputed the meaning of the terms "final non-appealable unfavorable ruling" in Section 2.05.   After "carefully reviewing the disputed provisions and the parties' competing constructions," former Vice Chancellor Slights concluded that "both parties have offered reasonable interpretations."[127]   The Court specifically noted:

> Because the language is ambiguous, it is difficult to discern the purpose of the second amendment, including . . . what the parties intended to accomplish that they had failed to capture in the original holdback language of the [APA].   Our Supreme Court has instructed that the contract construction exercise should give "sensible life to a real-world contract." . . . Was the point of the holdback to compensate for lost HHR revenue caused by an adverse Kentucky Supreme Court ruling?   If so,

---

[123] PTO ¶ 45; Compl. ¶ 2.

[124] Compl. at 20–22.

[125] *Id.*

[126] PTO ¶ 46; Dkts. 10, 20.

[127] Dkt. 40 at 15.

24

did the 2020 opinion cause such losses? Or was the point to provide deal certainty to a buyer and seller as of a certain date regardless of the actual consequences of the Supreme Court's ruling?[128]

Accordingly, the Court concluded that it made "sense for the parties to take targeted discovery of extrinsic evidence relating to the parties' intent with respect to the holdback provision generally, and more specifically the second amendment of the APA."[129] The Court instructed that "discovery should encompass evidence of the *Chicago Bridge* big picture. What were the parties attempting to accomplish with the holdback, and how was that big picture facilitated by the contract language the parties agreed to?"[130]

In mid-2023, the Parties cross-moved for summary judgment.[131] The Court denied both motions.[132] The Court noted that "both parties ha[d] recycled many of the same arguments they made when this Court initially concluded the Holdback Provision was ambiguous."[133] The Court also noted that the parties "did not attach to their motion papers any statements made by the parties about the Holdback during the course of negotiation, any communications between them regarding negotiations over the Second Amendment, or any contemporaneous communications addressing

---

[128] *Id.* at 18–19.

[129] *Id.* at 19.

[130] *Id.*

[131] PTO ¶ 48; Dkts. 56, 59.

[132] Dkt. 75 at 4.

[133] *Id.* at 15:1–3.

what the parties intended to accomplish with the Holdback."[134]  Accordingly, the Court concluded:

> In light of the foregoing—including the Court's prior ruling regarding ambiguity; the modest amount of extrinsic evidence regarding the drafters' intent; and the summary judgment standard, which requires me to view evidence in the light most favorable to the non-movants—I deny the parties' cross-motions for summary judgment on Sellers' claims.  Had the parties stipulated for a decision on a paper record instead of filing their cross-motions for summary judgment here, perhaps my ruling would be different.[135]

The parties proceeded to take the depositions of Winchell, Falcone, Reid, and Aronson.[136]  In February 2025, the Court granted the parties' stipulated order for trial on a paper record.[137]  The parties filed trial briefs,[138] and the Court held trial on May 13, 2025.[139]

## II.    LEGAL ANALYSIS

### A.    Summary of Dispute and Relevant Contractual Provisions

The central issue before the Court concerns the proper interpretation of the holdback language in Section 2.05 of the Second Amendment.  Amended Section 2.05(a) reads, in relevant part, that the holdback will be paid:

---

[134] *Id.* at 15:4–10.

[135] *Id.* at 21:10–21; PTO ¶ 49.

[136] PTO ¶ 50.

[137] Dkt. 82.

[138] Dkts. 87, 88, 92, 94.

[139] Dkt. 102; PTO ¶ 54.

(i) if there is a final non-appealable ruling in favor of the defendants in the Family Foundation Case . . . or (iii) so long as on the second . . . anniversary of the Closing Date [*i.e.*, March 8, 2021] there has not been a non-appealable Unfavorable Ruling prior to that date.[140]

Amended Section 2.05(b) provides:

If there shall be a non-appealable Unfavorable Ruling in the Family Foundation Case prior to the second . . . anniversary date of the Closing Date [*i.e.*, March 8, 2021], KRA shall have no obligation to pay the Family Foundation Holdback Amount.[141]

The Second Amendment defines "Unfavorable Ruling" as:

a final non-appealable unfavorable ruling in the Family Foundation Case[142] against Contributor,[143] finding either that (A) the Exacta HHR Terminals are not pari-mutuel horse racing games, or (B) the Commission's treatment of HHR under its regulations are invalid.[144]

Sellers argue that there was no "final non-appealable unfavorable ruling" before March 8, 2021, and thus Buyers breached the APA, as amended by the Second Amendment, by failing to pay the $10 million holdback amount. Buyers, on the other hand, argue that there was a "final non-appealable unfavorable ruling" in the Family Foundation Case before March 8, 2021, so payment of the holdback amount was not owed.

---

[140] JX004 at 3; PTO ¶ 30.

[141] JX004 at 4; PTO ¶ 32.

[142] *See* JX003 at 80 (defining "Family Foundation Case" as "the lawsuit in Franklin Circuit Court, Commonwealth of Kentucky, Case No. 10-CI-1154").

[143] "Contributor" is Plaintiff KYD, LLC f/k/a Kentucky Downs, LLC, a Kentucky limited liability company. *See* JX004 at 1 (Preamble); JX010 at 19.

[144] JX004 at 9; PTO ¶ 31.

27

In denying Buyers' motion to dismiss and Sellers' motion for summary judgment, former Vice Chancellor Slights held that both parties offered "reasonable interpretations of the disputed, undefined language and, in this regard at least, the [Second Amendment] is ambiguous."[145] The parties undertook discovery, which yielded some extrinsic evidence. Although not extensive, the record is sufficient to resolve the dispute and, in doing so, "give sensible life to" the agreement.[146]

This decision proceeds by first analyzing the plain text of the contract and then turning to extrinsic evidence. As explained below, much of the disputed phrasing is unambiguous and can be resolved without resort to extrinsic evidence. Only interpretation of the term "unfavorable" in the definition of "Unfavorable Ruling" warrants consideration of the extrinsic evidence. The grammatical structure of the definition suggests only one reasonable reading, but that is not dispositive, consistent with law of the case. The extrinsic evidence supports that reading, which makes resolution of the matter straightforward.

## B. Principles of Contract Interpretation

Under Delaware law, "[w]hen interpreting a contract, the role of a court is to effectuate the parties' intent."[147] "When conducting this analysis, [the Court] must

---

[145] Dkt. 40 at 15:13–24.

[146] *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 927 (Del. 2017) ("The basic business relationship between parties must be understood to give sensible life to any contract."); *accord LSVC Holdings, LLC v. Vestcom Parent Holdings, Inc.*, 2017 WL 6629209, at *6 (Del. Ch. Dec. 29, 2017).

[147] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

28

assess the parties' reasonable expectations at the time of contracting[.]"[148] "[A] contract's construction should be that which would be understood by an objective, reasonable third party."[149] "In discerning the intent of the parties, the [contract] should be read as a whole and, if possible, interpreted to reconcile all of the provisions of the document."[150] The Court "will read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage." The Court "will not read a contract to render a provision or term 'meaningless or illusory.'"[151]

Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[152] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[153] "Delaware courts will not destroy or twist [contract] language under the guise of construing

---

[148] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

[149] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (internal citations and quotations omitted).

[150] *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996).

[151] *Osborn*, 991 A.2d at 1159–60 (quoting *Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992)).

[152] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

[153] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

it."[154] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[155]

By contrast, when a writing is ambiguous, the court will look to extrinsic evidence to determine the parties' shared intent.[156] "[A] contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[157] When looking to extrinsic evidence, a court may consider "any admissible extrinsic evidence that may shed light on the expectations of the parties at the time they entered into the [a]greement."[158] As part of this exercise, the court "may consider evidence of prior agreements and communications of the parties as well as trade usage or course of

---

[154] *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[155] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[156] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834–35 (Del. Ch. 2007); *Texas Pac. Land Corp. v. Horizon Kinetics LLC*, 306 A.3d 530, 548 (Del. Ch. 2023) ("The 'parties' intent' is a term of art. Rather than referring to what the parties[] subjectively believed, it refers to the parties' shared intent as would be understood by an objective, reasonable third party.") (quoting *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014)).

[157] *Rhone-Poulenc*, 616 A.2d at 1196.

[158] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997).

dealing."[159] Ultimately, "a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation."[160]

The Delaware Supreme Court has also instructed that "the basic business relationship between parties must be understood to give sensible life to any contract."[161] Accordingly, "courts must read the specific provisions of the contract in light of the entire contract . . . especially . . . when the contract at issue involves a definitive acquisition agreement addressing the sale of an entire business."[162] A reasonable reading must, therefore, "be situated in the commercial context between the parties."[163]

Finally, the Court will "not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both."[164]

## C. The Non-Pari-Mutuel "Finding"

The Second Amendment defines "Unfavorable Ruling" specifically to require a "finding either that (A) the Exacta HHR Terminals are not pari-mutuel horse racing games, or (B) the Commission's treatment of HHR under its regulations are

---

[159] *Id.*

[160] *Salamone*, 106 A.3d at 374 (alterations in original).

[161] *Chicago Bridge*, 166 A.3d at 927.

[162] *Id.* at 913–14.

[163] *Id.* at 926–27.

[164] *Nemec*, 991 A.2d at 1126.

invalid."[165] The parties do not meaningfully dispute that there was a "finding" in the Family Foundation Case that "the Exacta HHR terminals were not pari-mutuel horse racing games"[166] (the "Non-Pari-Mutuel Finding"). The Kentucky Supreme Court's Family Foundation Opinion expressly held that the Exacta system "does not create a wagering pool among patrons such that they are wagering among themselves as required for pari-mutuel wagering[.]" [167] Thus, by March 8, 2021, one of the contractually specified "finding[s]" had been made in the Family Foundation Case.

## D. The Non-Pari-Mutuel Finding Was Embodied in a "Ruling"

The definition of "Unfavorable Ruling" also requires that the Non-Pari-Mutuel Finding be embodied in a "ruling." It seems clear that the Kentucky Supreme Court's Family Foundation Opinion constitutes a "ruling." The dictionary definition of that term dispels any doubt.

---

[165] JX004 § 27 (definition of "Unfavorable Ruling").

[166] *Id.*

[167] *Fam. Tr. Found.*, 620 S.W.3d at 597. The Kentucky Supreme Court explained: "As we have reviewed this case, the factual findings and arguments of counsel, two aspects of the Encore System fail to constitute 'pari-mutuel wagering.'" *Id.* at 600; *see id.* at 598 n.5. ("The Encore system is also known as the Exacta system."). First, "patrons wagering on randomly[ ]generated historical horse races within the Exacta System are **not** establishing odds with other patrons wagering on the same race(s). Emphatically, such patrons are not wagering among themselves as required by pari-mutuel wagering." *Id.* at 601 (bolding in original). Second, "[t]he betting pools are required to be established only by the patrons. And, as found by the trial court, based on testimony, a possibility exists that one patron could win all of the net pool, which would then require the association to step back in and replenish the seed pool. At such points, the pools are not created by the patrons as required by pari-mutuel wagering." *Id.* Indeed, the form of final judgment entered by the trial court on remand expressly provided that "the Kentucky Supreme Court entered an Opinion finding that the 'Encore system does not create a wagering pool among patrons such that they are wagering among themselves as required for pari-mutuel wagering.'" JX018 at 1.

32

In Delaware, courts routinely refer to dictionaries to discern a contractual term's ordinary meaning. [168] Black's Law Dictionary defines "ruling" as "[t]he outcome of a court's decision either on some point of law or on the case as a whole."[169] The Family Foundation Opinion reflected the outcome of the Kentucky Supreme Court's decision on a point of law, namely, whether the Exacta HHR terminals were not pari-mutuel horse racing games. It was thus a "ruling."

## E. The Ruling Was "Final"

The next question is whether the "ruling . . . finding that [] the Exacta HHR Terminals are not pari-mutuel horse racing games" was "final." Sellers urge the Court to use that term's "common or ordinary meaning" as provided by Merriam Webster: "not to be altered or undone" or "of or relating to a concluding court action or proceeding."[170] Sellers argue that "[i]f a decision is not a 'concluding court action or proceeding,' then by definition, it is not 'final.'"[171] Because the Family Foundation Case as a whole was not yet concluded, Sellers argue that the Family Court Opinion cannot be "final."

Defendants argue that because "the Family Foundation Case was a legal proceeding existing under Kentucky law, the determination of when the Ruling

---

[168] *Cornell Glasgow, LLC v. LaGrange Props., LLC*, 2012 WL 6840625, at *12 (Del. Super. Dec. 7, 2012).

[169] *Ruling*, *Black's Law Dictionary* (12th ed. 2024).

[170] Dkt. 88, Plaintiffs' Trial Brief ("Pls. OB") at 30-32.

[171] Pls. OB at 31.

becomes final is necessarily governed by the Kentucky Rules of Civil Procedure, which determine when a ruling of the Kentucky Supreme Court becomes final as a matter of law."[172]

Sellers do not appear to dispute that the Kentucky Supreme Court's Non-Pari-Mutuel Finding could not be "altered or undone." Indeed, Sellers recognize that the Family Foundation Case was remanded merely for entry of a judgment consistent with the decision. Thus, even under Sellers' preferred definition, the Family Foundation Opinion was "final."

Sellers' argument also ignores the context in which the term "final" is used in the contract. The term "final" is used to describe the Family Foundation Case, defined in the APA as "the lawsuit in Frankling Circuit Court, Commonwealth of Kentucky, Case No. 10-CI-1154."[173] At the time the parties were negotiating the Second Amendment, the Family Foundation Case was on appeal. Although Sellers recognize this,[174] they fail to give that context proper meaning. "When established legal terminology is used in a legal instrument, a court will presume that the parties intended to use the established legal meaning of the terms."[175] The parties used

---

[172] Dkt. 87, Defendants' Opening Pre-Trial Brief ("Defs. OB") at 31.

[173] JX003 at 80.

[174] Pls. OB at 30.

[175] *Agiliance, Inc. v. Resolver SOAR, LLC*, 2019 WL 343668, at *2 (Del. Ch. Jan. 25, 2019) (quoting *Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, at *12 (Del. Ch.), *judgment entered*, (Del. Ch. 2018)).

"final" to describe a "ruling" in a Kentucky lawsuit that was on appeal. Accordingly, whether the Kentucky Supreme Court's ruling is "final," or—using Sellers' parlance—"not to be altered or undone," is governed by Kentucky procedural rules.

Rule 76.30(2) of the Kentucky Rules of Civil Procedure[176] provides that "[a]n opinion of the Supreme Court becomes final on the 21st day after the date of its rendition unless a petition [for rehearing] under Rule 76.32 has been timely filed[.]"[177] "In the event of a timely petition [for rehearing] under Rule 76.32 if it is in the Supreme Court and is denied, the opinion becomes final immediately upon such denial[.]"[178] Moreover, the Kentucky Supreme Court has held that "an opinion of this Court becomes final immediately upon denial of a petition for rehearing."[179] Thus, the Non-Pari-Mutuel Finding embodied in the Family Foundation Opinion was final immediately upon the Supreme Court's January 21, 2021 denial of the petition for rehearing. Indeed, the January 21 memorandum from the Office of the Clerk enclosing the Kentucky Supreme Court's order denying the motion for rehearing

---

[176] On January 1, 2023, the Kentucky Supreme Court approved Kentucky's new Rules of Appellate Procedure, which "incorporate[] various provisions previously contained in [Kentucky's] Rules of Civil Procedure and effectively consolidates all rules regarding appeals into a single source and in the general order that they would occur in an appeal." Beth Breetz & Zachary VanVactor, *The New Rules of Appellate Procedure Are Here: What Kentucky Appellate Practitioners Need to Know*, Ky. B. Ass'n Bench & B. Mag., Mar./Apr. 2023, at 22. This decision cites to the pre-2023 rules in effect during the relevant time.

[177] Ky. R. Civ. P. 76.30(2)(a) (recodified without substantive change at Ky. R. App. P. 40(G)(1)).

[178] Ky. R. Civ. P. 76.30(2)(c) (recodified without substantive change at Ky. R. App. P. 40(G)(3)(a)).

[179] *Ashcraft v. Currier*, 694 S.W.2d 707, 708 (Ky. 1985).

provides: "PURSUANT TO CIVIL RULE 76.30(2)(E),[180] THE DECISION IN THE ABOVE CAPTIONED APPEAL HAS BECOME FINAL."[181]

Sellers argue that the Family Foundation Opinion cannot qualify as a "final . . . ruling" because the Franklin Circuit Court did not enter its Final Judgment in the case until after the March 8, 2021 deadline, with the trial court's form of Final Judgment itself being the subject of further appellate proceedings before the Kentucky Supreme Court. [182] But that interpretation inappropriately treats "final . . . ruling" and "final . . . judgment" as synonymous, when the parties treated them differently in the APA. "One principle of contract interpretation in Delaware is that the use of different language in different sections of a contract suggests the difference is intentional—*i.e.*, the parties intended for the sections to have different meanings." [183] Just two definitions above "Unfavorable Ruling" in the Second Amendment, the parties defined "Resolved Claims" to mean "Losses that have been resolved in favor of the KRA Indemnified Parties . . . pursuant to a final non-

---

[180] Rule 76.30(2)(E) (recodified without substantive change at Ky. R. App. P. 40(G)(5)) provides that, "[w]hen an opinion has become final, the clerk of the appellate court that rendered it shall forthwith send to the clerk of the trial court . . . a copy of the opinion[.]"

[181] JX011 at 1.

[182] *See* TT at 64:24-65:9 (THE COURT: "So your argument, then, means so long as there was not a final judgment before contractual deadline, then the payment would need to be made? COUNSEL: . . . the answer is yes.").

[183] *Williams Cos. , Inc. v. Energy Transfer LP*, 2020 WL 3581095, at *12 n.123 (Del. Ch. July 2, 2020).

36

appealable court *judgment*[.]" [184]  The parties' use of "final . . . ruling" and "final . . . judgment" in two different definitions (and on the same page) indicates the parties understood those terms to mean different things.

The term "final" here must be interpreted in the context of a "ruling" in a Kentucky litigation.[185]  Indeed, the very sentence in dispute that references "final" also references that Kentucky litigation, which was plainly on appeal at the time of signing.  The Family Foundation Opinion was "final" under Kentucky's procedural rules.  The ruling was thus "final."

## F.    The Final Ruling Was "Non-Appealable"

The next term for the Court to give meaning to in the provision is "non-appealable."  Sellers argue that the Kentucky Supreme Court's opinion could have been appealed until a date past the March 8, 2021 deadline because a petition for writ of certiorari to the United States Supreme Court was still possible.[186]  The Kentucky Supreme Court denied rehearing on January 21, 2021.  Per Rule 13 of the Rules of the Supreme Court of the United States, a party has ninety days from entry of judgment by a state court of last resort to file a petition for writ of certiorari.[187]

---

[184] JX004 at 9 (emphasis added).

[185] *Agiliance*, 2019 WL 343668, at *2.

[186] Pls. OB at 32–33.

[187] *See* U.S. Sup. Ct. R. 13 ("[A] petition for a writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last resort or a United States court of appeals (including the United States Court of Appeals for the Armed Forces) is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment. A

Ninety days from January 21, 2021 was April 21, 2021, more than a month after the contractual holdback deadline of March 8, 2021.

Buyers argue that the term "non-appealable" is directly tied to the Kentucky Supreme Court's finding that the Exacta HHR terminals were not pari-mutuel—not some other later occurrence within the case.[188] Buyers further argue that this specific point of law was purely a question of state law, and that the Family Foundation Opinion was a ruling from the highest arbiter of Kentucky state law.

Sellers have failed to prove that their interpretation is the more reasonable one. They identify no basis to conclude that the Non-Pari-Mutuel Finding in the Kentucky Supreme Court's Family Foundation Opinion was appealable. They argue that they could have filed a petition for writ of certiorari to the United States Supreme Court. But that would require some federal question, and the evidence shows that the Non-Pari-Mutuel Finding was purely a question of state law that did not address the validity of any federal law.[189] Because the Family Foundation Opinion did not concern a question of federal law, the decision was not reviewable by the United

---

petition for a writ of certiorari seeking review of a judgment of a lower state court that is subject to discretionary review by the state court of last resort is timely when it is filed with the Clerk within 90 days after entry of the order denying discretionary review.").

[188] Defs. OB at 38.

[189] The Kentucky Supreme Court's opinion did consider the federal statutory definition of pari-mutuel wagering, but the Court's ultimate decision was based purely on an interpretation of state statutes, particularly those enacted by the Kentucky Horse Racing Commission. *See Fam. Tr. Found.*, 620 S.W.3d at 600–02.

States Supreme Court.[190] Sellers' argument thus depends on the drafters intending the term "non-appealable" to include an appeal for which there is no good faith basis. Sellers failed to explain otherwise at trial.[191]

Sellers argue that they raised a federal due process argument, but they did so for the first time in their petition for a rehearing. Under settled precedent, a due process argument raised for the first time in a petition for rehearing "cannot serve as the basis for review by" the United States Supreme Court.[192] A party seeking to preserve a justiciable issue for appeal to the United States Supreme Court must raise that issue *before* filing a petition for rehearing.[193]

---

[190] *See* 28 U.S.C. § 1257(a).

[191] When questioned at trial, Sellers were unable to identify any good faith basis for appeal. *See* TT 40:6–15 (THE COURT: "What good faith argument for certiorari would an attorney in good standing sign her or his name to in . . . filing a cert petition on this question of Kentucky law decided by the Kentucky Supreme Court and then file that with the United States Supreme Court?" COUNSEL: "I would have to surmise, Your Honor, that there might be arguments about property rights being taken away, being deprived of those involved.").

[192] *Am. Sur. Co. v. Baldwin*, 287 U.S. 156, 163 (1932) ("The surety company petitioned for a rehearing. In that petition, besides reiterating several of its previous contentions, it urged, for the first time, that the rendition of the judgment on its undertaking violated the due process clause of the Fourteenth Amendment. The petition was denied without opinion. The federal claim there made cannot serve as a basis for review by this Court."); *Wills v. Texas*, 511 U.S. 1097 ("It has been the traditional practice of this Court [] to decline to review claims raised for the first time on rehearing in the court below.") (citing *Radio Station WOW, Inc. v. Johnson*, 326 U.S. 120, 128 (1945) ("Questions first presented to the highest State court on a petition for rehearing come too late for consideration here, *unless* the State court exerted its jurisdiction [over them on rehearing].") (emphasis and modifications in original)); *Herndon v. State of Ga.*, 295 U.S. 441, 443 (1935) ("The long-established general rule is that the attempt, to raise a federal question after judgment, upon a petition for rehearing, comes too late, unless the court actually entertains the question and decides it.").

[193] U.S. Sup. Ct. R. 14(g)(i); *Godchaux Co. v. Estopinal*, 251 U.S. 179, 181 (1919) ("The settled rule is that . . . the essential federal question must have been especially set up [at the lower court] . . . , and, further, that if first presented in a petition for rehearing, it comes too

The Franklin Circuit Court entered its Final Judgment in the Family Foundation Case on March 17 2021.[194]  The Family Foundation appealed entry of that judgment, and the appeal was finally concluded in March 2022[195]  But that appeal to the Kentucky Supreme Court did not address any justiciable issue for the United States Supreme Court.  That the respondent in the Family Foundation Case *could theoretically have* filed, or tried to file, a petition for writ of certiorari, notwithstanding that such a petition would have been baseless, misses the point and the contract's plain language.  The provision specifically uses the term "non-appealable," and, as a matter of fact and law, the Kentucky Supreme Court's "final . . . ruling" was non-appealable.[196]

## G. The Final Non-Appealable Ruling Was "Unfavorable"

The final question is whether the Kentucky Supreme Court's "final non-appealable . . . ruling . . . in the Family Foundation Case" was "unfavorable."  Sellers argue that it was not because the Buyers never actually turned off the Exacta HHR

---

late unless the court actually entertains the petition and passes upon the point."). Compounding this, Sellers have failed to identify any potential bases for appeal to begin with.

[194] PTO ¶ 40.

[195] Dkt. 20, Ex. 4; PTO ¶ 43.

[196] *See Appealable*, *Black's Law Dictionary* (12th ed. 2024) (defining "appealable" as "meeting the standards required for consideration by an appellate court; capable of being appealed."); *see also Unappealable*, *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/unappealable (defining "unappealable" as "not appealable; not subject to appeal") (last visited Aug. 13, 2026).

terminals nor "faced a negative impact due to the outcome of a lawsuit."[197] According to Sellers, the Family Foundation Opinion was not unfavorable because it "had no practical effect on Buyers, and the use of Exacta systems and HHR has never ceased at Kentucky Downs."[198] In contrast, Buyers argue that the holdback language in the Second Amendment is based on a specific finding—whether the Exacta HHR terminals are not pari-mutuel horse racing games—and outside events (such as actual loss incurred) are irrelevant.[199]

Buyers' interpretation of "unfavorable" appears to be the more "grammatically natural reading."[200] The definition of "Unfavorable Ruling" begins with "a final non-appealable unfavorable ruling in the Family Foundation Case against Contributor[.]" This noun phrase[201] is followed by a comma, setting off the phrase "finding either

---

[197] Pls. OB at 35. Sellers also emphasize that any judgment from the Franklin Circuit Court was not unfavorable because any prospective application was subject to Senate Bill 120. *Id.* at 35–36.

[198] Pls. OB at 35.

[199] Defs. OB at 24–25.

[200] *See ITG Brands, LLC v. Reynolds Am. Inc.*, 2019 WL 4593495, at *4 (Del. Ch. Sept. 23, 2019) ("In discerning the plain meaning of a contract, the court may look to the grammatical construction of a contractual provision."); *Symbiont,io, Inc. v. Ipreo Hldgs., LLC*, 2021 WL 3575709, at *35 (Del. Ch. Aug. 13, 2021) ("Delaware law uses grammatical rules and punctuation as 'useful signposts' to help a court determine plain meaning."); *see also Energy Transfer, LP v. Williams Cos., Inc.*, 346 A.3d 1089, 1106 (Del. 2023) ("The grammatical construction of [the contractual provision] is illustrative.") (citing *ITG Brands*, 2019 WL 4593495, at *4); *SeaWorld Ent., Inc. v. Andrews*, 2023 WL 3563047, at *5 (Del. Ch. May 19, 2023) (taking grammatical approach to interpretation of parenthetical language).

[201] *See* Bryan A. Garner, *Garner's Modern English Usage*, 1225 (5th ed. 2022) (defining "noun phrase" as "[a] phrase with a noun as its head; noun cluster that may include a determiner <the goat> and one or more adjectives <an old barn>").

41

that (A) the Exacta HHR Terminals are not pari-mutuel horse racing games, or (B) the Commission's treatment of HHR under its regulations are invalid."[202] The word "finding" in this phrase is a present participle, and the phrase that follows is a participial phrase.[203] A participial phrase is "[a] phrase consisting of a participle and a modifier or complement and functioning as an adjective," and "may appear before or after the subject." [204] Here, the participial phrase "finding that (A) . . . or (B) . . ." modifies the noun phrase headed by the subject "ruling" in the preceding clause.[205] An "unfavorable ruling in the Family Foundation Case against Contributor" could mean a number of things. For example, a ruling shifting attorneys' fees against Contributor would be unfavorable and could trigger the holdback without further clarification. That is where the participial phrase does work—it clarifies and narrows

---

[202] JX004, § 2.05(b).

[203] *See* Garner, *supra* note 201 at 1229 (defining participle as "[a] verb form inflected for . . . progressive aspect (for present participles such as *carrying, flying, or lecturing*); esp., a word derived from a verb but having characteristics of both a verb and an adjective," and noting that "[a] participle functions as an adjective when it modifies a noun or pronoun"); *see also id.* (defining "present participle" as "[a] nonfinite verb form ending in *-ing* and used in verb phrases to signal the progressive aspect" and noting that "[a]lthough present participles are often part of a verb phrase, they may also function adjectivally").

[204] *Id.* at 1231.

[205] *See id.* ("In *The monarch butterflies migrating from Mexico look fragile but are quite hardy*, the participial phrase *migrating from Mexico* modifies the subject, *monarch butterflies*. Likewise, *hiding behind the curtains* modifies the subject *burglar* in *Hiding behind the curtains, the burglar planned his next move*."); *see also* Bryan A. Garner, *The Redbook: A Manual on Legal Style* § 11.29, at 223 (4th ed. 2018) ("If a participial phrase doesn't start a sentence, it should modify the noun, pronoun, or noun phrase that most closely precedes it.").

the more general category of "final non-appealable unfavorable ruling in the Family Foundation Case against Contributor" with two specific "finding[s]."

This is further evidenced by the fact that both the "finding[s]" in the participial phrase would logically be unfavorable to the Contributor—*i.e.*, KYD, LLC f/k/a Kentucky Downs, LLC—in the Family Foundation Case. KYD was one of the petitioners in the Family Foundation Case that sought a declaration that the HHR machines were pari-mutuel games. A finding to the contrary—that the HHR machines were *not* pari-mutuel games—would naturally be unfavorable. The same goes for the second finding—that "the Commission's treatment of HHR under its regulations are invalid." The Commission had been treating HHR machines as pari-mutuel games, so a finding that such treatment was invalid would likewise be unfavorable to KYD and the other petitioners in the Family Foundation Case.[206]

"[A]lthough the more natural reading is a factor to be considered, it does not conclude the analysis. Even a less natural reading of a contract may be reasonable for purposes of an ambiguity inquiry."[207] "When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different

---

[206] Sellers' position also ignores that one of the Buyers' conditions precedent to the deal was that "[t]here shall have been no Unfavorable Ruling (whether or not appealable) in . . . the Family Foundation Case." JX003, § 7.05. In other words, an Unfavorable Ruling would upend the transaction's closing—even if still appealable. This is consistent with an understanding that an Unfavorable Ruling in the Family Foundation Case would materially change the value of the business, without any need to wait and see what the actual effect would be.

[207] *Village Practice Mgmt. Co., LLC v. West*, 342 A.3d 295, 314 (Del. 2025).

meanings, there is ambiguity," and "the interpreting court must look beyond the language of the contract to ascertain the parties' intent."[208]  Sellers' interpretation of "unfavorable"—though tenuous—could support a reasonable interpretation.

This Court previously held that both sides offered reasonable interpretations, rendering the holdback provision ambiguous. [209]  Delaware's "'law of the case' doctrine requires that issues already decided by the same court should be adopted without relitigation, and, 'once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless compelling reason to do so appears.'" [210] Accordingly, the Court will look to the extrinsic evidence to resolve the ambiguity.

## H.    Extrinsic Evidence

Sellers—as the plaintiffs here—bear the burden of demonstrating, by a preponderance of the evidence, that their proffered reading was "the common understanding of the parties" at the time of contracting.[211]  Sellers have failed to meet

---

[208] *Eagle Indus.*, 702 A.2d at 1232.

[209] *See* Dkt. 40 at 15 ("The fact that one proffered construction may be deemed more reasonable than another does not mean the disputed provision is unambiguous so long as both are reasonable.").

[210] *May v. Bigmar, Inc.*, 838 A.2d 285, 288 n.8 (Del. Ch. 2003), *aff'd*, 854 A.2d 1158 (Del. 2004) (citation omitted).

[211] *United Rentals*, 937 A.2d at 834 n.112; *see also Bell Atl. Meridian Sys. v. Octel Commc'ns Corp.*, 1995 WL 707916, at *6 (Del. Ch. Nov. 18, 1995) ("[I]t becomes incumbent upon the party seeking judicial enforcement of their interpretation of the ambiguous language to show by a preponderance of the evidence that the other party knew or had reason to know of the meaning they attached to the language.").

that burden.  As explained below, the extrinsic evidence presented by the parties supports Buyers' reading, not Sellers'.

The parties presented just 19 joint exhibits at trial, four of which were deposition transcripts.  Notwithstanding this sparse record, the extrinsic evidence sheds light on the parties' shared understanding of what would constitute an "unfavorable" ruling in the Family Foundation Case.

### 1.    Documentary Evidence

As originally executed, the APA's holdback language required Buyers to fund the $10 million holdback amount into an escrow fund, which would be released to Sellers two years following the deal close, reduced by any indemnifiable losses incurred by Buyers as a result of any Unfavorable Ruling.[212]  Following execution, Buyers' lenders sought to revise this formulation.  Email correspondence among the parties details the lenders' request to "eliminat[e] the holdback escrow concept and mak[e] it a straight obligation to pay $10,000,000 if the Family Foundation Case is resolved favorably or if it is still outstanding in 2 years."[213]

The parties implemented this change.  Through the Second Amendment, the parties revised Section 2.05(e) (now Section 2.05(b)) of the APA to remove the indemnification framework and simply tie the holdback to a final non-appealable

---

[212] *See* JX003 § 2.05(e) (providing that in the event of an Unfavorable Ruling in the Family Foundation Case, KRA "shall be entitled to payment of an amount equal to its indemnifiable Losses determined in accordance with Article XII out of the Holdback Escrow Fund[.]").

[213] JX016.

unfavorable ruling in the Family Foundation Case.[214]  Sellers' interpretation would

revert this bargained-for amendment.  Sellers' position is thus contradicted by the

documentary evidence.

## 2.  Testimonial Evidence

Deposition testimony also confirms that the parties intended for the Second

Amendment to reflect a straightforward holdback for which Buyers would not have

to prove actual losses.[215]  Winchell and Falcone testified that the changes made to the

holdback provision were intended to assuage lenders' concerns and account for the

risk posed by the Family Foundation Case.[216]  Testimony from Sellers' own witness

is in alignment: Reid testified that Winchell relayed the lenders' concerns to the

Sellers and that these conversations were reflected in the Second Amendment.[217]

---

[214] *Compare* JX003 § 2.05(e) *with* JX004 § 8.

[215] Reid Dep. at 10:13–23 ("[Winchell] called me and expressed his concern or the concerns of the potential lenders in the transaction that the risk involved in terms of the transaction were making them uncomfortable."); Winchell Dep. at 26 (testifying that the holdback amendment "helped with the lenders, kind of giving them some confidence that the sellers didn't think that . . . they were selling something bad. . . . And it got the deal done is basically what the second amendment did."); Falcone Dep. at 48-50 ("Q: Were you ever involved in any communications with Mr. Aronson and/or Mr. Reid regarding the holdback language?  A: Yeah. I think we provided some email exchanges regarding the holdback language, as it was requested by our lenders at one point as we were negotiating various points back and forth.  There were some email communications, and I'm sure there was some phone call communications."); *id.* at 22:21–24 ("I think the holdback was put in place and the ultimate payment obligation was put in place to protect us in the event of the uncertainty of the Family Foundation case.").

[216] *See, e.g.*, Falcone Dep. at 49:22–50:12, 54:23–55:17; Winchell Dep. at 15:24–17:2, 21:20–22:10.  Falcone also testified as to risks other than financial loss.  Falcone at 26:12–27:12.

[217] Reid Dep. at 10:2–23.

Deposition testimony also shows that the Buyers' focus was on the potential immediate fallout from an unfavorable ruling from the Kentucky Supreme Court, not any actual losses that might result from any further proceedings in the Family Foundation Case. The parties understood that the Kentucky Supreme Court's decision would determine the legality of the HHR terminals, independent of any further proceedings at the trial court. Winchell testified that an unfavorable ruling would mean "sudden death" and potential "bankruptcy."[218] Falcone similarly relayed his understanding that an unfavorable ruling would mean "a complete wipeout of all the equity and likely a bankruptcy filing[.]"[219]

Additional deposition testimony shows that the Buyers treated the Kentucky Supreme Court's Family Foundation Opinion as unfavorable. Winchell and Falcone testified that immediately following the Kentucky Supreme Court's decision, and before the Franklin Circuit Court issued its Final Judgment,[220] the Buyers were on calls with other HHR facilities to assess risk exposure;[221] were advised to shut down

---

[218] Winchell Dep. at 18:7-19.

[219] Falcone Dep. at 15:20–16:2.

[220] JX018.

[221] Falcone Dep. at 24:6–12 (testifying that the Buyers engaged in calls with Red Mile and Churchill, two other horse racing facilities in Kentucky).

by their attorneys and experts; [222] saw other HHR facilities shut down to avoid Loss Recovery Act suits; [223] and began lobbying the legislature to change the law.[224]

Winchell and Falcone also testified that the Buyers chose to keep Kentucky Downs' HHR business open while they continued their lobbying efforts, despite their knowledge of the enormous risks this presented. For instance, multiple lawsuits were filed against KRA under Kentucky's Loss Recovery Act during this time. The Loss Recovery Act allows losing gamblers to reclaim money lost on illegal wagers.[225] And if the losing gambler fails to sue within six months after the loss, "any other person may sue the winner and recover treble the amount or value of the money or thing

---

[222] Winchell Dep. at 71:21–72:3 ("I think our concern was . . . we get on these calls with the industry . . . attorneys and experts, and they say, look we recommend—we were actually recommended to shut down during that time[.]").

[223] Winchell Dep. at 36:20–23 (noting that Red Mile—another Kentucky racetrack—decided to shut down its HHR operations during the same period because it chose not to accept the risks).

[224] Winchell Dep. at 35:11–37:6 ("Marc [Falcone] and I spent . . . five months running around the state of Kentucky meeting with various legislature members . . . and trying to express . . . how important it was to the industry and what happens."); *id.* at 39:9–41:5 (describing process of providing governor with a letter of commitment to pass Senate Bill 120 by a slim margin); *id.* at 50:24–52:20 (Q: "And you testified a little bit earlier about the efforts that you and Mr. Falcone undertook following that decision by the Supreme Court, and it sounds like you spent quite a bit of time lobbying, meeting with people, working through other avenues trying to secure a favorable outcome in the legislature. Is that fair to say? A: Yeah, obviously we were trying to save our skin, if you will, save our investment, save our business."); Falcone Dep. at 18:4–20:1 ("[T]hat resulted in a lot of front-line meetings with driving across the state with senators and House of Representative members to rural counties to highly sensitive religious areas to try and convince the political climate and the political people within office within the state of Kentucky in order to educate them on HHR, educate them [on] the drastic impact this could have[.]").

[225] Ky. Rev. Stat. § 372.020.

lost[.]" [226]   Buyers' witnesses testified that they were aware of these risks but continued offering HHR gaming because of lender requirements in their credit agreements.[227]

In support of their contrary position, Sellers repeatedly reference one-off statements from Winchell's and Falcone's depositions.[228]   Those statements cannot, however, carry the weight that Sellers place on them.  They are outweighed by the documentary record and the deposition testimony discussed above.

### 3.      Summary of Extrinsic Evidence

Considering the text itself (the comma and the participial phrase) and the extrinsic evidence, including the Second Amendment and the deposition testimony, Buyers' interpretation gives sensible life to the contract.  Requiring actual loss for the ruling to be unfavorable could be a perfectly reasonable approach—indeed, that is what the APA originally required.  But the parties amended the APA and cut that

---

[226] Ky. Rev. Stat. § 372.040.

[227] Winchell Dep. at 36:9–19 (testifying that the Buyers were aware of Loss Recovery Act whereby "if you get caught . . . operating a [prohibited] gaming business, then you're liable for three times . . . like three times the bet line, how much was bet."); Falcone Dep. at 23:23–24:18 ("But we knew we had to stay open, and we knew because of our credit agreement and our lender requirements, and we had very limited flexibility.  So we took additional risk, obviously, to continue to operate the business despite the ruling of the Family Foundation case.").

[228] *See, e.g.,* Pls. OB at 2, 3, 15, 17 & n.33, 18, 29, 50, 55, 56 & n.136 (quoting variations of Falcone's testimony that "I think that was there to sort of protect us against the actual outcome" (Falcone Dep. at 24:19–25:13)); *id.* at 17 n.31, 24, 56 n. 136 (quoting Winchell's testimony: "Q. But at that time, that was the point of the holdback language was to ensure your loss against how the Family Foundation case would turn out in the end; correct?  A. Yeah, I think that's, you know, part of - - what made it become a more straightforward payment obligation" (Winchell Dep. at 87:4–10)).

requirement. They also assumed an unfavorable ruling would be a disaster, without the need to show actual losses, and acted accordingly following the Kentucky Supreme Court's decision. The possibility of legislative change would have been known to all—if the law does not fit, you can try to change it—though the outcome of any effort to do so was far from clear at the time. [229] The fact that Buyers were fortunate enough to avoid shutting down Kentucky Downs does not alter the contractual language or the parties' intent at the time of agreement. In hindsight, Sellers may wish they had bargained differently, but they cannot avoid the agreed-upon terms.

Sellers have failed to prove that their interpretation of the term "unfavorable" is the more reasonable one. Buyers' interpretation aligns with the parties' shared intent at the time of drafting, as demonstrated by the extrinsic evidence. Sellers' interpretation, on the other hand, is inconsistent with the extrinsic evidence and the overall contractual scheme.

\* \* \*

---

[229] Buyers, in fact, did not expect their efforts to move the needle in the Kentucky legislature. *See* Winchell Dep. 38:16–24 ("Q: And when you started this process, did you have any certainty that you'd be successful? A: No. I think . . . Damon Thayer, who was the Senate Majority Leader who did a lot of work with Ray Reid and those guys . . . said this thing had no chance of getting fixed. And so it started out as zero chance to get it fixed, and . . . we just worked the system for five months and helped it get across the finish line."); Falcone Dep. 20:2–20 (testifying that public support for legislative change was very mixed, and "it was a difficult process that, really, frankly, only passed marginally by, I think five, six, seven votes" in the state legislature).

After reviewing the extrinsic evidence, the Court concludes that the Kentucky Supreme Court's Family Foundation Opinion triggered the Second Amendment's bargained-for holdback provision. Buyers are therefore entitled to retain the $10 million holdback amount.

## III. CONCLUSION

Judgment will be entered in favor of Buyers. The parties are instructed to confer and submit a joint form of implementing order consistent with this decision within ten business days. The parties will also advise the Court if there are any outstanding issues that need to be decided.